We'll call our last case of this afternoon. Numbers 12-1402-1405 and 12-2924. So that's 1402 through 1405 and 2924. Mr. Silverman, Mr. Donnelly, and Mr. Bentley. Thank you, Your Honor. I'm Moses Silverman for the Bank Lenders, and I'd like to reserve five of my 20 minutes. No problem at all, sir. Thank you very much, Your Honors. There's been a lot of discussion this afternoon about the absolute priority rule. The issue in my appeal is a simple one, or at least it's simple to say, which is can the shareholders keep all of the equity, now valued at $6.3 billion, by the way, and in Brooklyn we also had the same expression, that they'd done good at $6.3 billion. When the bank lenders are not paid their contractual default rate, and the difference there was $185 million at the time we submitted our brief. It goes up at a little over $160,000 a day, and it's now $199 million. Mr. Silverman. Yes, Judge. Yes, sir. Since you've laid the foundation. Yes, sir. Further building on that foundation, would you explain to me how under the code, or explain to me, excuse me, would you explain to me how under this plan that's proposed that the lenders are impaired? Certainly, Your Honor. The lenders are impaired because they're not getting their contractual entitlement, and they're not getting their contractual entitlement to interest that the contract says they're allowed at a time when the debtor is solvent. The absolute priority rule, Your Honor, which is well known to the court, specifically has been found by the Supreme Court. I understand.  Yes, sir. I think in answer to my question, though, you merged two concepts. Yes, sir. You said they're not getting what they were entitled to. Yes. Because the lender was solvent. But how do you get around Section 502? Your Honor, Section 502. 502B specifically talks about the allowed claims and the unmatured interest. Right. 502B says our allowed claim is our principle. But this court in PPI Enterprises specifically said that in the fair and equitable test of 1129B, a creditor is impaired if he does not also receive the interest. And specifically, the court quoted the bankruptcy court as saying, to be unimpaired, the claim, and it's unsecured claim there, must receive post-petition interest. And then on the next page, 207, this court said, we agree with the bankruptcy court's analysis. So with respect, this court has decided that issue in PPI Enterprises when it said just that. And it also said in that case. Although PPI was a 502B6 case, not a 502B2. That's correct. But the significance of the court's discussion there, Your Honor. Where are you reading from? Which specific? I'm reading from the. I know you're reading from PPI, but. PPI, Your Honor, I was reading from page 206, where the bankruptcy court is quoted as saying what I just said. And in the next paragraph on 207, they say, we agree with the bankruptcy court's analysis. And the other quote that I read is footnote 14 of that opinion. But to answer Judge Ambrose's question, yes, it dealt with a different section, but the creditor there was trying to make an argument expanding. Yeah, but footnote 14, let's look at that. An impaired creditor. That's correct. It says an impaired creditor in a solvent debtor case can demand post-petition interest. Yes, sir. All right. So what makes us impaired? I ask you, what makes you impaired? Okay. And I referred you to what the text of the opinion says, which is if you don't get paid your interest and the debtor is solvent, you are impaired. That's what the bankruptcy court said. That's what this court said in the next paragraph when you said we agree with the bankruptcy court's analysis. And if you read this section of the opinion, you specifically dealt with the amendment in 1994 to the Bankruptcy Code when Section 1123-4, I believe it was, subsection 3 of 1124 subsection 3 was removed. And this court, quoting the legislative history in the PPIE decision, said the reason that section was removed was because there was a district court decision called New Valley, which, by the way, is what the judge below in the bankruptcy court relied on, which had used that section to say that there was no entitlement to interest in a solvent debtor case. And the legislative history quoted by this court in PPIE says specifically, in order to preclude the unfair result in the future, the committee finds it appropriate to delete section 1124-3 from the Bankruptcy Code. I'm reading from the part of the legislative history that's in this court's opinion in PPIE Enterprises. So this court dealt directly with that. The only thing my friend says in response is, well, that's dicta. It's not dicta. It was a part of the holding, and it's an essential part of the decision. So with respect, Judge Fischer, this court has decided that question. Go ahead, Mike. Sorry. I'm not sure that this court has decided that question as clearly as you are articulating here. I'm also not sure it's part of the holding. And I think that the reference in that case was you're cherry-picking that opinion for purposes of trying to get around 502B. Now you're cherry-picking it articulately. I'll give you credit. I'll give you credit. I'll give you credit for that. I take that as a compliment. I'll give you credit for that. I'd like to be persuasive, but just articulate. I'm not going to give you persuasion. Maybe, but articulate. I just don't see how you can make that argument in light of the language of 502B. 502B says what are allowed claimants. But the whole history of the absolute priority rule is a history that says that interest is part of what you are entitled to get. If the debtor is able to pay for it as they clearly are now. That's what the Supreme Court said in Consolidated Rock. That's what the Supreme Court said in Bruning when it said as a result of good fortune and or good management, the estate proved sufficient to discharge the claims in full interest as well as principal should be paid. That is part of the absolute priority rule. And that, this court said in Armstrong, is now what the rule is in 1129B. Do you agree with me that if we conclude as a court that your client is unimpaired, that the case is over? If we are unimpaired, within the meaning of the absolute priority rule, we are not entitled to the interest. But we are impaired. All right. I just want to, you agree with that? We're on common ground, Your Honor. Okay. But we are impaired because under the fair and equitable test, we are not getting our contractual entitlement. I'd like to cite several cases for that proposition. The first is the Supreme Court's case in Bruning, I'm sorry, in Butzner, which says that property rights are created by state law. Our property right is the contract law that gives us the default interest right. It should only be taken away if it's inconsistent with the federal bankruptcy provision. I'd also like to cite Chicago-Milwaukee Railroad Judge Posner's opinion, which says where shareholders stand to recover, quote, the task of the bankruptcy court is simply to enforce creditors' rights according to the tenor of the contracts that created those rights. That was the case under the Act, isn't it? It was, Your Honor, but it was a case that established the basic principle that is part of the Act now, as this Court said in Armstrong, which is that creditors get paid in full. And that's what this Court said in Silco. And then the question becomes, if you have a right to get post-petition interest, what should that number be? That is correct, Your Honor. Should it be the federal legal rate of 4.19? Should it be 6.09, which was contained in the 2005-2006 letter agreements with the committee? Should it be the contractual rate that you're talking about? Yeah, well, it's 6.09 under the plan, only through 2005, I think. It goes much down since then. Right, it goes from floating rate. But let me answer your question. I think the cases I've cited say you look to the terms of the contract, and the case that dealt with this exactly is Dow Corning, the Sixth Circuit case, which said that where there's a solvent debtor, interest must be paid at the default rate, absent compelling equitable considerations. Now, in terms of the federal judgment rate, that's only applicable in our submission under 1129A, not under 1129B. There is no case that says the interest you're entitled to is the legal rate under Section 726. But just to discuss that for a moment, the legal rate has to mean ---- Before you get to that, let's go back to the analysis that was started by Judge Fischer. When you talk about footnote 14 in PPI, it talks about solvency or insolvent. Correct. It seemed like the courts here, bankruptcy court and the district court, made a strong point that there hasn't been a determination of solvency here. And I'm not sure why. May I respond to that? Yeah. I think they were looking at the wrong thing. When the courts that talk about a solvent debtor are talking about a solvent debtor, what they're talking about is a debtor that has the funds at the time of confirmation to pay all creditors in full. That is what the courts are talking about, and that is clear if you look at any of the opinions. Chicago, Milwaukee, if you look at Butner, if you look at the Beverly Hills case, general growth properties, when they talk about a solvent debtor, they talk about basically the absolute priority rule, and is there enough money at the time of confirmation. None of those cases do what my good friends persuaded. You don't think that they're talking about solvency in the way it's defined in the code? I don't think they're talking about solvency at some hypothetical time during the proceeding, which was what, mistakenly in our judgment, the bankruptcy court chose to look at. The issue is the absolute priority rule. And the point that I heard made many times today, is there enough money to pay the creditors in full before and still something left over for equity. When the courts talk about a solvent debtor, that's what they mean, not something hypothetical. Let me come back. Yes, Your Honor. I'm going to ask the same question of Mr. Donnelly. Why wasn't solvency determined by the bankruptcy court here? Your Honor, there was an expert for the debtor that said it was impossible to determine solvency, and the bankruptcy court faulted us for not putting in more evidence. But my submission is that was the wrong issue. There is no case that says you have to look at solvency. How can that be the wrong issue? Your argument hinges on the assertion that you're impaired. You've acknowledged that here. Correct. And the cases that you've cited, PPI and others, talk about being entitled to the contract default rate when the debtor is solvent. So, solvency and impairment are hand in glove, and they're essential to your argument, are they not? Judge Jordan, absolutely. Okay. And so, is the burden yours or somebody else's to show up and say, Well, we argue the burden in our brief, and we argue that the burden is theirs. But I think it's a really simple issue. If you look at the cases that talk about a solvent debtor, what those cases are talking about when they're talking about a solvent debtor is at the time of confirmation, is there money left over for equity? There's $6.3 billion of money left over for equity here. The question of did we prove solvency with respect makes no sense in our submission. Stick with me for a second. Of course. Is this a question of fact, or is it a question of law, or is it a mixed question? The issue of solvency, what kind of question is it? Your Honor, this Court said in Armstrong that the application of the absolute priority rule is a question of law, and it's entitled to the noble review. I'm asking about solvency. Solvency is a question of fact or law. Or a combination of both. I would say it's a combination of both because you have to accept the first point that I'm trying to make, if you do, which is that we're talking about solvency at the time of confirmation. And there is no question about solvency at the time. If it's a fact question, it's conceded. This company had billions for equity, and that is the definition of solvency that any case is looking at. Because the reason they're asking the question about is this a solvent debtor isn't about some point in the past. It is at the time of confirmation. What is, if anything, should we make of the district court's shot at you in footnote 135 of the opinion where it says, the bankruptcy court repeatedly informed the interested party, including the bank lenders, they would need to present evidence if they wish to pursue any claims based on grace of solvency, despite repeated invitations and opportunities. The bank lenders never did so. We believe we did, Your Honor. But the point is, during that hearing, the issue of whether or not the company was solvent before they determined what the asbestos settlement would be is irrelevant to the question of whether or not the debtor, at the end of the day, at the time of confirmation, has sufficient money left over for the equity, to keep its equity worth billions. That's my submission. Let's do this one step at a time. And I think the judge looked at the wrong issue with respect to that. Let's do this one step at a time. Yes, Judge Embro. Judge Jordan's question was, did you put forth any evidence with respect to solvency, or at some point did you do a walk away? We did put forward evidence. What was it? I'm not in a position to say because that's not the issue we raised in our appeal, Your Honor. The issue we raised in our appeal is whether or not the company was solvent at some earlier point is not the relevant question. The question under the absolute priority rule is, does the company have money to pay creditors? Time out. I'm sorry. At some point, there was a hearing that related to solvency. When did that hearing begin and when did it end? I believe it was 2009. Is that correct? I believe it was 2009, Your Honor. And so that was about a year, two years before the actual confirmation. That is correct, Your Honor. And at some point, that hearing, as I understand it, terminated without a determination of solvency. And I'm trying to figure out just a simple question, why? I can't speak for the judge and I wasn't trial counsel. All I can say is in my submission, whether or not the company was solvent before it resolved what the asbestos claim was and what the settlement was is not relevant. And I hear myself repeating myself. It wasn't relevant to determine whether the company was solvent. It wasn't relevant to the question of whether the company would be solvent at the time of confirmation when the question is, are there sufficient funds left over for equity to maintain its state? You objected, your clients objected to the plan. Yes. You objected to the amount of interest that was proposed to be paid and said we're entitled to $185 million more. Correct, Your Honor. Okay. If the basis of that additional recovery was that W.R. Grace was solvent, didn't as objector you have the burden of showing solvency? Your Honor, the plan called for equity, the shareholders to keep their entire equity. That is the definition of solvency. What the Bankruptcy Court was doing in our view. You like the Dow case from the Sixth Circuit, don't you? I'm very fond of it, Your Honor. It's my favorite one. Don't they talk about factoring in the equitable considerations? You're saying solvency case over. I'd like to address. Dow certainly doesn't take it that far. I'm facing red lights and I'm hearing multiple questions which I'd like to answer. You're on our time. Well, thank you, Your Honor. I'd like to address the equity separately for a moment. But in terms of the Dow case, if you look at the Dow case, or you look at any of these cases when they're talking about solvency, they're not saying that during the course of the hearing two years before confirmation there was an adjudication of solvency. They're saying this company, this debtor, can afford to pay the creditors in full and endow with interest because there is equity left over for the original shareholders. And that's what they mean by solvency. It was a fool's errand, with due respect, to be trying to try the hypothetical question of whether or not this company. Why is that a fool's errand, sir? If the court has to make a determination. I did not mean that disrespectfully. Unnecessary. If the court has to make a determination about impairment, and the court does, and that impairment, at least in a context like this, is influenced strongly by a question of solvency, how can the court wait until the time of confirmation and put all that off? Doesn't the court, as a practical matter, how is the court supposed to deal with the solvency issue pre-confirmation, without having a hearing sometimes pre-confirmation to come to a conclusion? Judge Jordan, I don't know that there was such a hearing in any of these cases, but I believe the simple answer is if. Wait, there was. I'm sorry. There was a solvency hearing. You just acknowledged this. No, no, no. In any of the other cases that we rely on, my point is if the plan calls for the equity to maintain value, that is solvency in our submission. So the end, the be-all, the whole shebang, as far as the bank lenders are concerned, is no matter what happened before, when you got the confirmation, when it was clear that the equity was going to keep everything, that was solvency, and the court was sua sponte responsible for acting on that. Well, we certainly urged, I don't know about sua sponte, we certainly urged it, but yes, Your Honor. If a plan calls for equity to keep value, there is a solvent debtor, and under the absolute priority rule, the creditors must be paid in full. Could I, I don't mean to cut this. I mean, you're not allowed, and the court's not allowed to look at any equitable factors under your plan. Well, I'd like to address the equitable factors. Okay, if you would. Oh, thank you very much, Your Honor. The DAO did say, and I don't know where they got it from, but they did say that unless there were compelling equitable factors, the default rate of interest should be paid. Would the compelling equitable factors include that the bank lenders walked away and wouldn't put evidence on about solvency? I wouldn't think so, Your Honor, if you accept my position that that was not relevant, although we did put in evidence. I, however, as appellate counsel, am pinning my argument not on whether or not we proved something that, you know, before the asbestos claims were agreed on, you know, it's anyone can say anything about it. Well, let me give you something more tangible. Yes, Judge Fischer. What about the agreements that led up to 2008? I've been trying to get there, but I keep going another direction. What about them? Aren't those equitable factors? Didn't your clients, at least the other side would argue that, that they led them to believe that you would accept the reduced rate of interest below the default interest rate? I've been trying to get there, so let me respond to that now. Okay. Thank you so much. First, I would like to make the point that the Bankruptcy Court did not find there was any inequitable conduct. There was nothing in the Bankruptcy Court opinion. She ruled against us on issues of law, which we disputed and are raising before this Court. Secondly, the Equity Committee took the position in the Bankruptcy Court that they were not contending that we acted inequitably. Third, and I will get to the specifics, but just as background, in our submission the absolute priority rule is equity, and the Second Circuit said it best in the Ruskin case where they said it would be the opposite of equity. The question relates to the 2005-2006 agreement. Yes. Let me address that to Rick. It says it doesn't bind individual members of the committee, but they also put out documents that they claim that were put out publicly and there was no objection to them. Yes, you are. Judge, as a matter of equity, should you be stopped from claiming that you go back to post-petition interest at the default rate under the contract? Let me respond to that. As Your Honor said, there were negotiations between the Creditors Committee, not the bank lenders, the Creditors Committee and Grace starting in 2004 with respect to a proposed 2005 plan that is no longer before this Court. I just said, correct, I understood. But they then put out that this is the number that's been agreed to, 6.09, with an amendment in 2006, and for they claim a couple of years you didn't say anything. Your Honor, several things. First of all, there was never an agreement with the lenders. You got that point. Secondly, the Creditors Committee cannot bind the lenders. This Court said that in Kensington. You want me to focus on exactly what they say they did to rely? Let me address that. On the fact that they put out that it's like they wanted to deal with you first before they dealt with the asbestos issue, asbestos claimants issue, and how much that would be, and they thought that they perhaps had a deal or something close to a deal, and for two years they put out this is the number and you did not object, and if you did not object, that's equity. It's called estoppel in legal terms. Your Honor, first of all, I think the fact that they never had a deal with my clients is relevant, but we'll go past that. What they say they did is they put things in their SEC disclosure about what their assumption is of what deal they could make. The 2005 and 2006 letter agreements by their terms expired in 2007. When my friend says by their terms they also gave your clients more money than they were otherwise getting, not after 2007, those deals were over. And those were just deals with the Creditors Committee to support a plan that no longer exists. There was no plan support agreement with the bank lenders, and the fact that when they put out some statements that say what their It makes no sense. And, Your Honor, we have quoted in our reply brief specific acknowledgments. Whoa, whoa, whoa. Time out. Yes, sir. They put out a number and they say you're supposed to object if you disagree with that number. And if you don't disagree, then somehow you're saying it's irrelevant? Your Honor, there was an agreement that ended in 2007. They put out, when you say they put out, they put out in SEC filings what their estimates were. As soon as this new plan was, a new plan came out with specific interest rates that didn't give us the default rate of interest, the bank lenders objected in April of 2008, and that letter is in the file. And they specifically acknowledged that they knew that the creditors were not bound by any agreement of the Creditors Committee. The Creditors Committee can't bind it under Kensington and Armstrong. And they acknowledged that the disclosure statement for 2005 said that the agreement it had with the creditors, quote, does not commit any creditor to vote for the plan. That's in their disclosure statement. And their general counsel testified at the confirmation hearing when asked about an e-mail from the Creditors Committee counsel that said we need to make sure people, our creditors are free to vote against the plan. And he was asked, the general counsel, Grace, was asked what that meant. He said, quote, he said certain lenders, quote, might object and they sought to preserve their right to object, a right that I guess we believe they had all along. That's the general counsel saying he understood that the creditors had a right to object to the plan and ask for their contractual default rate of interest all along. So with respect, I don't think we misled anybody. They understood that the specific lenders were free to vote the way they wanted to, regardless of what the Creditors Committee did. And by the way, Judge, the Creditors Committee agreement was for, the reason it expired is because there was supposed to be a confirmation by 2007. That's six years ago. I understand. Why don't we hear from Mr. Donnelly and we'll get you back. Okay. There are a number of things that would have been fun to talk about. Perhaps we can get to them in a bit. Thank you. Thank you. Thank you, Your Honor. Let me begin by answering why solvency was never determined, and then I'd like to turn to the equities because they affect some of my other arguments. There was a trial from January through April of 2008 in the bankruptcy court. It lasted 10 days, but it was spread out over that time, and it was the debtor against the Asbestos PI Committee and the Asbestos FPI future claimants representative to determine the size of the asbestos liability. There was a big spread. Mr. Kruger of the committee council who testified under O said at that time, during that trial, they were watching very carefully because they were interested in solvency. He said, quote, there was a great deal of uncertainty about whether Grace ultimately would be solvent or not. It's at page 201, 615 of the joint appendix. And there was such a big spread, $7 billion to $200 billion, it settled. At which point they said, we're not agreeing to the deal anymore. And then Judge Fitzgerald. They're not agreeing to the deal. There's no deal. There's no deal. By its terms, it was over, right? And moreover, the deal that you, I mean you start off your brief by saying a deal is a deal, but there's no deal. They're accepted from the. Yes. If I could just ask, I'll come back to that on the equities and just finish briefly why the solvency was never determined. Don't come back to it. Deal with it now because it's not a matter of equity. It's a matter of black and white in the documents. The deal expires by its terms in 2017. And even if it still was extant today, they weren't bound by it, the lenders. No. The letters, if we go back to them and read them line by line, say, they can exercise a right to terminate them if the plan doesn't go effective by X date in 2007. They never did that. Wait. Let me say they never did that. Section 6 of the 2005 agreement, each party expressly acknowledges and agrees the support agreement is not binding upon each individual member of the accreditors committee. Absolutely. We never disputed that. He spent a lot of time on that. We don't dispute it's contractually binding. Okay. It's equities. Back to Judge George's question. What's the deal? So if it's not binding, how can you appeal to it as a matter of equity? They say to you up front, no individual here is going to be bound by this. Run away with it if you want. We can all jump ship if we want. If you don't have a deal by 2007, all bets are off. The reason is, I'll come back to the solvency later. Let me turn to the equities. I think I can boil down why the equities help us into three basic facts that aren't disputed or largely aren't. The first answer to that is that there was a deal or what? No, the first fact, Your Honor, is that when the negotiations took place and the letter agreements were reached, whether setting aside whether they were contractually binding, that was a time when everything was very, very fragile. The negotiations were fragile. The chances that we would even get to a consensual resolution were very, very iffy. And the Asbestos PI Committee was taking the position throughout this time, 2005 to 2008, that the lenders were going to have to get, everyone would have to give a haircut. The lenders would have to give up not only all of their interest but their principle. Mr. Shelnitz's testimony at 21572. So we're not talking about post-petition interest, default interest. There was an issue whether they would give up their principle. So it's real easy to look back 2020 hindsight and say there's a cushion. But at the time in the dark days of 2005 to 2008, this is just fact number one. It's not disputed. Everyone recognized the deal was fragile and would take a haircut from everybody. Fact number two, we agree they're not contractually bound. So let's just take that off the table. If they're not contractually bound, why is the opening line in your answering brief that a deal is a deal? Because of the equities. This is a situation where we knew. You've lost me. Well, let me back up. Let me back up. We knew that individual lenders weren't bound. There's an email in their reply where there was some talk about some of these claims trading and we didn't know for sure if those lenders would be bound. We knew that. What we didn't know and what was news for the very first time in April of 2008 after the term sheet, and it was a blockbuster, is that the major holders who had sat across the table, Mr. Maher from J.P. Morgan, and all of the major holders of the equity were going to walk out in a 100-cent block en masse the day after the term sheet was reached. And the reason that's inequitable, I'm not saying it's contractually bound. The reason it's inequitable, Your Honor, is something that Judge Fitzgerald said best at a hearing on September 29th, and it's only a few lines, so let me just read it, because I think it captures our view of the equities, which doesn't turn on a contractually binding deal. Go ahead. She said the lender's contention, she said your contention, is that a creditor's committee can negotiate with the lender's consent to a particular rate of interest so that the plan can get filed. And then the lenders, after they've agreed to that rate of interest for purposes of plan negotiation, can turn around and disagree with that rate of interest simply because once the plan is actually filed and then returns a distribution to equity as part of that plan, the lenders then feel that they're entitled to more interest than the plan provides despite what they've agreed to. Okay, so Mr. Donnelly, stop, and now let's enter the first. Would you agree that we don't even walk into the world of equity unless and until the legal rules are getting mushy, right? I mean, we don't have to resort to equity. If we can look at the black and white, we can understand what sophisticated parties. I don't get any indication that you guys aren't well represented, that there's not really sophisticated experts, parties, advisors, on all sides of this. Isn't that right? It's not a question of our getting hoodwinked or our not being big boys and being able to stand up. Okay, so how is it inequitable? For you to have letters which are not, from what I can see, they don't even appear to be signed, but you get letters and they say, look, this is the creditors committee, this is what we're saying, and no individual lender is bound by this. They could all walk out. And, Master, you're told that in the letter. How is a court supposed to look at that and say, oh my gosh, that's just unfair. They had an unsigned letter from somebody that said we're not bound by it, and now they're asserting they're not bound by it. I think the reason is it's more than that, Your Honor. So in a complicated mass tort case, like this one, or think of one coming down the road, if the rule of law they're advocating is adopted, which is that this type of behavior is equitable. This type of behavior, which type? The behavior where they sat across the table for three and a half years and said here's what Mr. Kruger testified from the committee. And I'm sorry, it wasn't in our brief, but it's responding to something in their reply at 201, 613, and 15 in the Joint Appendix. He said, we sat across the table, neither he nor Mr. Marr from J.P. Morgan ever told Grace that a majority of the holders opposed the plan, never told them that, in fact, there were votes to vote against the plan, never told them that J.P. Morgan and the other major holders would walk out. Your position is they were obligated, even though it was in black and white, to tell you in advance, by the way, if you reach $5 billion in equity and you keep 100% of your stock, we're probably going to want our contract default interest rate. You're thinking that that's the point of confusion here and that's what's inequitable? Nobody had any idea of $5 billion at the time. At the time, this was fragile. It all could have fallen apart. And 05, 06, 03, however far back, okay. Let's move off equity here for a minute and have you speak directly to Mr. Silberman's assertion that solvency is relevant at plan confirmation. That's when you have to look at it. What's wrong with that assertion? Where is that legally flawed? So we cited authorities in our papers, 101, 32, definition of solvency of the debtor, not the reorganized debtor. We cited the cases, Billman. But accepting that it's the debtor, not the reorganized debtor, at what point do you look and say, debtor, this is what we have to pay attention to? One day before confirmation? At least one day before you go affect them. Because here's the thing about this case. This is really a unique or very, very close to unique mass tort case where this one massive mass tort liability drives everything. And the debtor only, reorganized grace, only becomes solvent. Equity only gets to keep that money because of this deal that came together where the minute after you go effective, the 524G protections are in place. So if you look back to the critical time in 2008 when we're negotiating and we're in these hard negotiations and everybody has to take a care, including maybe them, on their principle. At that point in time, things were very, very fragile and we needed everybody together. And the pie was like this. And it was only because everybody, including them, came together and made their commitment, whether they were legally bound or not. I don't hear you answering the question I'm trying to put you in. It could be because I'm not asking it well. I apologize, Mr. Donnelly. I'm trying to ask a very specific legal question. It doesn't have to do with the facts of this case or any other case. The assertion made repeatedly by your opposing counsel is the question, the pertinent question is what is the state of play when there's a confirmation? Is there enough to pay the creditors without giving the equity holders everything? Is that wrong as a matter of law? If he's saying you judge by the minute after you go effective, that is the wrong point. I didn't hear him say you judge by the minute after. I heard him trying to say, look, here's what it looked like on the day that was presented for confirmation. They were going to keep everything. It's not signed. It's not confirmed. They were going to keep it. The equity holders were keeping everything, and we weren't getting our contract default rate. They're therefore a solvent debtor. They produced the best interest analysis that showed them solvent under Chapter 11, and we didn't get our contract default rate. That's not right. I'm trying to get you to answer this specific assertion, which he kept going to, which is they keep 100 percent of their equity. That's solvency by definition. If he's wrong, I'm asking you to tell us how that's wrong. We believe it's wrong because he's got the wrong period of time. He's mixing two periods of time. After you go effective and the 524G protections are in place, this massive value has been created for everyone, for equity, for them to get their principal and $450 million interest for the Asbestos Committee to get what they're taking.  When you go back to the point in time during the case, during the Chapter 11 or during the confirmation hearing, then it's completely unknown. The liability could be $7 billion and we could be insolvent. It was never determined at that time. Isn't it all a gamble up until that time? It's all a complete gamble, and we were in peril of being potentially liquidated, not going forward, not being able to survive at all. They were in peril. When you look at how the stock traded or the interest in the debt traded, it was rising as you were getting closer to confirmation. It looks like the value of the enterprise was increasing significantly. And the question is, when do you take that into account for purposes of a plan? Isn't it really, in effect, just before the plan is approved? And we'd accept that before the plan is approved, Your Honor. But the problem is, at that point in time, we can't tell if the debtor is solvent or not. Actually, am I right or wrong? Is it just before the plan is approved or just before you go effective? I'm asking in terms of determining solvency. We believe it's at the time of the confirmation hearing. Okay. And if it's at the time of the confirmation hearing and in preparation for that confirmation hearing, you present to the court a best interest analysis that shows solvency. Maybe I've misread it, and you could help me. Because I will freely grant I am not as sophisticated and accurate in these financial things as the people here in this room. But I looked at that, and it said the value available to unsecured and asbestos claimants is between $4.28 billion, $4.68 billion. Unsecured claims estimated at $1.39 billion in interest. There's going to be an estimation here that shows there's more money than there is liability. And I look at that, and I think, hey, to an average schmo like me, that looks like solvency. I can address that, Your Honor. And the same expert, the restructuring expert from Blackstone, Pam Zilly, did the liquidation analysis and testified that solvency couldn't be determined on these issues. And what she said in the liquidation analysis is she took the liability in a liquidation. You're taxing me going back, but I believe what she said, liability in a liquidation is going to be very high, like over $10 billion, because there's a rush to the courthouse to take care of all these claims. Under the plan, I'm going to accept this expert's number, the PI committee's expert's number for purposes of determining the plan. And I believe her analysis was once you go effective, after the effective date. Her testimony then during the case was that solvency couldn't be determined because that liability was never known. The projection for liquidation was it can't be known. But the projection wasn't it that in a Chapter 11 there will be solvency? Wasn't that the statement that Grace made to the court in its best interest analysis? As part of the best interest analysis, assuming one expert's number and the same expert said for the solvency analysis it can't be determined. Okay, so that's you put that forward. Mr. Donnelly, you talked about equities here, you talked about solvency. What about the code itself? I mean, am I wrong if we find that the lenders are unimpaired? Isn't that case O? Yes, sir. You haven't spoken about that yet. I got sidetracked on the solvency. Well, you got sidetracked. So let me come back to equities and I thank you. So they have to show three things. The SOLO versus PPI enterprise case, that's our case, Your Honor. In that case, Mr. SOLO was a landlord who owned an apartment building in New York with a 10-year lease. The tenant walked out. He sued him to collect. He had nine years to go on the lease or many years to go on the lease. SOLO sued him in New York State Court. It took a few years because the courts are slow there. And literally on the evening before the damages prove up, the tenant filed for Chapter 11. It kind of looked like a bad faith issue. Time out. It's your case. This is your case. How? By analogy? By analogy to 502B6. Because it's a 502B6 case. By 502B6. Because Mr. SOLO said. This case is 502B2. Yes, sir. But it's the same exact principle involved. And the principle is? Mr. SOLO said, I have a state law contract right. I want my 10 years of lease payments under this rental agreement. And this court said, no, you're not being impaired by the plan. You're being impaired by the code because 502B6 limits and caps lease payments at one year. Or there's an alternative, but one was one year. And so Mr. SOLO, even though this tenant walked out and this debtor walked out and there was probably a bad faith problem, he didn't recover his out-year lease payments because he was impaired by the code. It's the exact same thing here. They say, we have a state law contract right. We're entitled under Provision 5.1. If you don't pay principal and interest, we don't care if it's during a bankruptcy case for any reason. We have a state law contract right to recover default rate interest at prime plus 2. But here, he's impaired by the code. And I know we cite three provisions, 502B2, 362, and 363, but the main provision we rely on is 363. It's our position that Section 363 effectively prohibits us, as it did in the next wave for the debtor in the next wave case, from paying principal and interest during the case. Doesn't that gut all contracts? If we take that view, there's nothing left. I mean, the code itself recognizes the contract. I don't write tab wait. If the assertion is that under 363 all bets are off on all contracts, that just doesn't even seem to square with the code itself. It's not all contracts because under 363, there was an example in this case where you could have critical trade vendor motion that we could move under 363 to have those paid, because those contracts are critical. So it's the contracts that the debtor likes? No. The contracts that the debtor wants? No, it's the ones that the other unsecured creditors objected because 363 is in there for their benefit. This is not like the EPA claim they raised. That's $250 million. It was late in the case. All the other creditors consented to paying that off early because the government was arguing it was non-dischargeable. It was $1 billion, take the $250 million deal and get rid of it. This is a situation where on day one of the case, they're suggesting for a $500 million loan to the large lenders, we go in and get approval to pay that off, and that's unprecedented. That's never happened in any case I'm aware of under Section 363 for a loan of that size and where there was grave, grave doubt as to whether anyone, including those lenders and everybody else, was going to be paid in full and even get their principal. So we couldn't. Is that really their position? Is their position that when everything was hanging in the balance, they were going to get everything? Or is their position when nothing's hanging in the balance because you're a multibillion-dollar company on the eve of confirmation, you can't say to them, and we keep everything, and you take the haircut? That's the position they're arguing, whether it's got merit or not, is something we've been discussing. But I'm having trouble with your assertion that the only time you're looking at solvency is when it could all fall apart. Our problem with that is I know they wouldn't be here making that argument if our market cap had dived down, and it was as low at some points. I think it got down to $60 or $70 million during the case, so it was all over the map, and it was hard to tell if the company was solvent or in. By 2009, 2010, 2011, it was on the ascendancy, and since then it's gone up exponentially. It has, and that's good for everyone, including the creditors with the warrants. How much, as of the time in the plan, how much was being proposed that goes to equity? Equity retains their interest subject to equities contributions, which are $490 million of warrants, an obligation of the company to pay $1.8 billion in cash, $500 million of insurance. So equity was impaired. I know, Your Honor, you made a comment earlier, equity kept everything. Well, they keep their stock, but the stock is diluted by something between $2 and $3 billion in equities contributions. But the absolute priority rule is until everyone before them, whether it be secured, whether it be administrative, priority, unsecured, they have to get paid in full before a dime can go to equity, right? If we had just the classic historical absolute priority rule, and you know our position is that under Dow Corning, that now has two parts. It's not just absolute priority mechanical analysis. It's a balancing of the equities as well, and that's why we went into the equities. So what harm would there be if the monies that they claim additionally for interest were given to them? It sounds like nothing would really change. I thought about it. I mean, the plan hasn't gone effective yet. I thought about it, and it's a very good question, and I think it goes broader than this case. It's the harm, and again, I think it's mixing points in time. At the critical time when things came together or not, in 2008, we needed everyone except them, including them, to take a haircut. It all came together. Why did we go back almost three years before we have confirmation? Because the harm is if they're allowed to sit across the table, even though not contractually bound, and stand up to an interest letter rate agreement, whatever we call it, for three years, and the deal gets done only because of, number one, that, and then number two, the pie has grown. I mean, the company's assets were very much in question. Nobody's arguing that point with you, Mr. Donnelly. You've made that effectively in your papers, that there was a period here where things were very dicey, and I think all credit should be given to the numerous parties and their advocates who helped turn this thing around. It's a significant success story. The question we're wrestling with is why is it that that point in time is the crucial point in time when you acknowledge that the documentation is such that everybody knew they had, in a sense, reserved their rights. They could come out of the box any time they wanted and say, we're out. Right. And the evidence was everybody knew, a minority or some, the representations were the big boys, the J.P. Morgans were still standing by the deal as late as April 4th. And my concern, yes, I understand the question. It's compelling to say it is $5, $6 billion market capitalization today and things worked out well. But the reason I keep going back in the time is at that time, we didn't know that was going to happen. We were put in peril. You know what? Today we got lucky and things worked out and that's great for everybody. But we don't know. And in the next case, the rule of law's people, it's Judge Fitzgerald's question. The lenders are saying it's worked out for everybody except for them. Well, they're getting – One could make an argument. They're getting $950 million, all their principal and $450 million. Understood. It's a lot better deal than the poorest – And my comment initially to the law clerks was, you know, this case is about money. But here, if they do have a right to contractual interest and it's not precluded in some way, whether it be by Ipso facto provisions or by 502B2 analysis or whatever, if they do have that right, then the absolute priority rule does kick in and they have a right to get everything before a dime goes to equity. Understood. And we think on the 502B6 analogy in SOLO, that alone wins for us. And before you sit down, let's just go through where we stopped on solvency. Why did the solvency hearing stop? Yes, sir. I mean, I could take a guess. My guess is maybe you didn't want solvency to be resolved at that point in time because you have to have an indeterminate amount of claims in order to get a 524G channeling injunction, and there's a bit of tension between what could have been determined on solvency and whether you actually qualify. That's a great question. I'd never thought of that, but it's a great question. It's not what happened. Let me back up and start at the beginning, and here's what happened. The litigation estimate trial was really brought on by us, the debtors. And the reason it was brought on is we wanted to cram down on the asbestos personal injury claims and say they were unimpaired. We wanted a result that said we're solvent and the liability was low, and we put on the experts who said the median value of the liability is only $468 million. We had 10 days of trial with expert testimony during those first few months of 2008. We arrested our case, and we thought it was going pretty well, and they thought their recovery, both the personal injury claimants and the future SHREP thought they were in peril. They had their own experts saying the liability is much bigger, so big to render the whole company insolvent at $7 billion, and both sides cut their losses and pressed by Judge Fitzgerald settled for roughly $3 billion. That's why it stopped. Now, why wasn't it continued? There was a claim proceeding, proofs of claim by the lenders for default interest, and they filed proofs of claim saying we're entitled to default interest under our contract and an exception to the normal rule under 502B2. They had a claim objection proceeding going on, and that's where Judge Fitzgerald, and we quote in our papers five, six times, where she kept pressing them, if you want to meet your burden of proving solvency, you've got to restart the trial yourself. And at one point, Mr. Kruger for the committee said, it's in our response brief at page 19, we're prepared to continue with the estimation procedure. And I believe they didn't, despite he said that they would and she was pressing them, because they were in peril if it was restarted and the number came in so big. They would lose even the plant, not default interest, they'd lose the plant interest and they'd lose some probably pretty big chunk of their principal. So that's why it wasn't restarted. Is the right, if this really does come down to a question of solvency and the determination was never made, is the right thing for this thing to go back for a question of solvency? The plan's not effective at this juncture. That's also another great tough question I've thought about, Your Honor. And I think the answer is no, because they had the opportunity at the time and they were repeatedly pressed and they, in effect, waived it, waived it over a period of six months to a year when the judge repeatedly asked them to do it. So the burden, I won't repeat our papers, we believe the burden of proof under both the claim, proof of claim under the 9014 contested matter and under plan confirmation was on them to establish solvency. And when they had the opportunity and were actually pressed hard and Kruger said on September 28th we're going to do it and they didn't take up the cudgel at that time. Why is the burden on them, by the way? Just, number one, for a claim proceeding, the burden going forward is on the claimant under rule. They make a prima facie case with their proof of claim. We put in evidence from Zilli countering that and the ultimate burden's back on them. But you put in evidence, but if you had put in evidence that you were insolvent, that might be one thing, but you just said a moment ago that you wanted to come out a determination that you were solvent. Is that right? That's what our experts were saying at the solvency hearing and then on their claim. So if you're saying you want the outcome to be that you are solvent, it almost would, if you were in Mr. Silverman's shoes, then say I don't need to prove anything else. They're, in effect, conceding that they are solvent and we'll go on that. Well, he'd be saying that the $3 billion settlement essentially established the solvency. I don't think the settlement could do that. It just was a resolution of a claim. All right, just so you can see life at 10,000 feet, the concern that we have is that if we put out an opinion that says that what you're doing, and let's assume for the moment, if they are entitled to the additional interest and you don't say that that's a violation of the absolute priority rule under what you're doing, then the consequences of this are that it's just free game. Equity stays in the money. You can see how people, academics, could read this and other courts. And the reason I appreciate the concern, and we've given that a lot of thought, and the reason I think that won't happen, Your Honor, is precisely because what a unique case this is. It's a case with this. I mean, you just don't get these cases. I think it is unique. It's this $7 billion. You just told me that it wasn't unique because it's so analogous to Dow Corning and the Sixth Circuit. Oh, it's totally different from Dow Corning because Dow Corning is a case. The factors apply. The legal tests from Dow Corning they're relying on. But in Dow Corning, it was stipulated from day one that the company was solvent. That's why this case. Those weren't your words about 15 minutes ago. I'm sorry. I misspoke, and I apologize. In Dow Corning, the Sixth Circuit's opinion, I don't know if the page referenced, but they say it was agreed by all the parties that the company was solvent from day one. That's what distinguishes this case and makes it unique. It's a mass tort case. That's right. You may have said PPI. Yes, PPI is where the solvency was never determined. Maybe it's not unique, but it's unusual. In this case, there was no pre-petition default. Almost all the default interest cases are pre-petition defaults because the company is in financial distress, and you don't want them to be able to cheat the hangman and get out of interest by just filing a Chapter 11 petition and getting away with it. But the mass tort case, I think this is the only mass tort case where this issue comes up. And so I don't think it's going to create a precedent for other cases. It's a unique circumstance where solvency, this big split, was never determined. We believe had the burden, and so I think it's a narrow holding limited to the facts of this case. And I do have a concern about the equities, whether it's contractual or not. Remember my assumption and my question. If they are entitled to the contract rate of interest with respect to default, then don't they have to get paid the full amount in order not to be a foul of the absolute priority rule? If they're entitled and survive the equities factor and if they're not impaired. Correct. Okay. Thank you. Thank you, Your Honor. Mr. Bentley? Mr. Bentley? Do you have anything else? Or I'm sorry, if they are. And I mean if they are impaired. If they are impaired, I misspoke. Sorry. I've been on your feet a lot today. I think that Mr. Bentley decided to secede all of his time. That's fine. That's fine. I'm sorry. No problem. And I can understand why because I fear that I do much better before this court when I'm sitting down. And so I rise with some fear. You just said it better than I did. I rise with some fear, but if there are issues on your mind, I'm here to address them. There are just a couple of things I'd like to say in response, and then I would really like to address whatever is on your mind. I heard my friend Mrs. Donnelly say that the relevant time for determined solvency is the time of the confirmation hearing. At the time of the confirmation hearing, I believe the stock was trading at close to $2 billion in terms of net cap. And I stand corrected. My colleagues who were involved in the case at the time reminded me that we did put in evidence, and we put in evidence of exactly that, what the trading value was and what the market cap was, relying on the Vlasic-Pickle-Campbell case, which I believe, Judge Jordan, was your honest case in the district court, in which, in a different context, the market cap of the company was considered very meaningful evidence of solvency, and we put that in. But it was irrelevant to the judge because what she was looking at was some hypothetical, if we don't resolve the claims, is the company solvent? And that, as I've said in our submission, was the wrong question. Well, we spent a lot of time with Mr. Donnelly on the question of what's equitable or not. Yes. And it would be helpful, to me at least, if you responded directly to his quotations from the record where he cites Judge Fitzgerald, and I quoted you the district court's footnote 135, which have the tenor of saying, you guys were laying in the weeds and that's intolerable. We can't have that happen. What's the response? Well, most of my response is what was in your questions, Your Honor. That is to say, the creditors' committee can represent our interests, but they cannot bind us. If you wanted to find out what the bank letters were committed to, you could enter into an agreement with them. They did not. To have an agreement that assumes the plan, sets an interest rate that assumes the plan will be finalized by 2007, does not commit to an open-ended agreement on what interest rates, particularly because, if you remember, the 2006 letter agreement changed to the floating primary, which really killed us over time, and we would never have agreed to that if it was open-ended. That was an agreement just to 2007, and it was not an agreement with us. But Judge Jordan's point is why didn't you object that in 2006? Your Honor, what mechanism is there for a lender to say — It's a simple letter. We don't agree to that. But there wasn't a reason for them so to do. That plan was off the table. And then there were negotiations, and we pointed out in our reply brief, there were negotiations we weren't part of between the asbestos claimants, and they went into a room. They came out with a new plan. It's now several years later. Interest rates by now have fallen to the floor. And there was an agreement in 2005 that the interest rates would follow the prime rate, at least through 2007. It's now 2008, 2009. They're down to the floor. Why would we want to continue with that, and why would we be obligated? And as soon as the plan came out, as soon as they came out of the room, the bank lenders by an April 2008 letter, which is in the record, said we object to this once they knew what the plan was and what the rate was. This isn't a situation where they agreed with the creditors' committee, and certainly not with the lenders, that whatever the plan is, this is the interest rate. Whenever it becomes a fact of who cares, you'll agree to a floating prime rate forever. There was no such agreement, and there's no reason why we should have. There was nothing that we were required to do. We had filed a proof of claim in 2003. When you say there was nothing we were required to do, that's what I'm hoping you're getting to, because the courts, the bankruptcy court and the district court, seemed to think there was something you were required to do, that there was an insolvency discussion days of hearings and a burden of proof that the courts believed you carried, and you just declined to put evidence on it and yet are coming forward now and saying insolvency is the issue that they're pushing. With respect, Judge Jordan, that's a different issue. That happened in 2009. 2009, they knew where we stood on interest. We told them that as soon as the new proposed plan came out in April 2008. With respect, Mr. Shulman, it's not a different issue. The issue remains the question of is there an equitable concern we should have, and part of the equitable concern being pressed on us is, expressed perhaps obliquely but expressed by the bankruptcy court and the district court that you had your chance. I invited you to put evidence on. Solvency is at the heart of what you have to demonstrate. Insolvency or solvency is a crucial issue here, and you didn't come forward, so I'm not inclined to hear you now. That's the gist of it, and I'd appreciate it if you'd just tackle that head-on. Absolutely, Your Honor. First of all, we did put on the evidence of what the net cap of the company was at the time. She didn't think that was good enough. She wanted us to establish on our own what all of the liabilities were before they'd been agreed to, and that was something that was not relevant to the question of whether or not there would be equity left at the end, which was specifically planned in the plan under consideration, whether it was a billion, whether it was $2 billion, whether it was $3 billion, who knows. But they were proposing a plan that says there's equity. That, in our view, shows solvency, and we therefore don't understand, I don't understand, and I'm submitting to the Court that there was anything more we needed to do to prove solvency for purposes of the absolute priority rule and the requirement that creditors be paid before equity can keep any value. All right. Thank you. Thank you to all counsel, to you and Mr. Donnelly. I would ask that a transcript be prepared of this hearing and that you split the cost between your side and Mr. Donnelly's side. Of course. Thank you very much. Thank you very much.